SMITH et ux. v. MONROE GROCER CO., Limited, et al.

No. 5527.

Court of Appeal of Louisiana. Second Circuit.

Jan. 3, 1938.

Rehearing Denied Jan. 28, 1938.

Writ of Certiorari and Review Denied March 7, 1938.

Theus, Grisham, Davis & Leigh, of Monroe, for appellants.

Harry V. Booth and Chas. B. Emery, both of Shreveport, for appellees.

DREW, Judge.

This case was consolidated with James v. Monroe Grocer Co., La.App., 179 So. 505, for trial; both cases arising out of a collision between a school bus and a beer

truck in which the minor sons of the plaintiffs lost their lives.

The lower court, in a well-written opinion, has clearly stated the pleadings and the facts and, in our opinion, has arrived at a correct conclusion. Its opinion is as follows:

"Andrew R. Smith and Mrs. Susie Smith, his wife, father and mother, respectively, of Melvin Lee Smith, brought this suit against the Monroe Grocer Company, Limited, and the Trinity Universal Insurance Company, its insurance carrier, to recover the sum of $14,250, with legal interest thereon from judicial demand, and for all costs, as damages sustained by them when their said son, Melvin Lee Smith, was killed in a collision between a school bus, owned and operated by one Iddo L. Alford, and a beer truck, owned by Monroe Grocer Company, Limited, and operated by its employee, Ollie Grayson, on the Dixie-Overland Highway, or U. S. Highway No. 80, in Lincoln parish, La., on Friday, August 30, 1935, at about 9:30 p. m.; said Melvin Lee Smith being, at the time of the accident, a fare-paying passenger of the said school bus.

"William E. James and his wife, Mrs. Daisy Fletcher James, the father and mother, respectively, of Oscar James, also brought suit against the same defendants for the sum of $11,250, with legal interest thereon from judicial demand, and all costs, as damages sustained by them on account of the death of their said son, Oscar James, who was killed in the same accident and under the same circumstances as was Melvin Lee Smith.

"The issues in both suits being identical, they were consolidated for the purpose of trial, and accordingly were tried together. The issues applicable to both suits will be discussed in this opinion.

"On the 24th day of July; 1935, Melvin Lee Smith and Oscar James, whose parents reside at Plain Dealing, in Bossier parish, and in Shreveport, Caddo parish, respectively, enrolled in the CCC and were immediately thereafter stationed at Camp Sanders, near Mt. Herman, in Washington parish, La., for duty. A goodly number of other boys who had likewise enrolled in said service from the parishes of North Louisiana were also stationed at the same camp.

"Just prior to August 30, 1935, Melvin Lee Smith and Oscar James, together with thirty-odd other enrollees of said camp, desiring to visit their respective homes on Labor Day, through Lieutenant Lassard, their commander, arranged with Iddo L. Alford, a man who resides in that community and owns a large school bus, to transport said enrollees in his said bus to or in the vicinity of their respective homes, and, at the conclusion of their said visit, to return them to camp. Said trip was arranged on condition that each enrollee making the trip would pay a round-trip fare of $2 for the trip; the fare to be paid in advance. Accordingly, all arrangements having been made and all fares having been paid, the said bus, with its owner, Iddo L. Alford, as its driver, left Camp Sanders about 1:30 p. m., on Friday, the 30th day of August, 1935, to make said trip; the city of Shreveport being the ultimate destination of the trip. Thirty-five enrollees, including Melvin Lee Smith and Oscar James, were passengers on said school bus.

"The said school bus proceeded on its journey, uneventfully, until it reached a point about eleven miles east of Ruston, in Lincoln parish on U. S. Highway No. 80, generally known and referred to as the Dixie-Overland Highway, where it met and collided with a large beer truck owned by the Monroe Grocer Company, Limited.

"At this point the general direction of the highway is east and west. The school bus was traveling west toward Shreveport and the beer truck was traveling east toward Monroe. The accident happened about 9:30 p. m., and was caused by the two vehicles 'sideswiping' each other as they met on the highway. Oscar James was killed instantly, and Melvin Lee Smith was fatally injured and lived until 2:45 o'clock next morning, when he too died.

"Highway 80 is paved, the pavement being the standard width of 18 feet, with a black stripe or center line from 4 to 6 inches wide, extending along the center of the pavement, equidistant from the outer edges of same. On each side of the concrete slab is a dirt shoulder, the original construction width of which was 6 feet. Perhaps at this time the shoulder is not quite so wide as it was when constructed due to the effects of erosion over a number of years.

"At the scene of the accident the said highway traverses a hill of what may be termed medium height, as compared to the height of the other hills of that section. As the highway ascends this hill, going

east, it makes a rather sharp curve over the hill to the right and, going west, it makes the same type of curve over the crest of the hill to the left; the apex of the curve in the highway being about the crest of the hill. The accident happened at a point just east of the crest of the hill, just after the beer truck had passed over said crest and just as the school bus was nearing same. Various witnesses estimated the distance between the two vehicles, at the time the beer truck was on the crest of the hill and at which time it came into the view of the driver of the school bus then ascending the hill from the other direction, at from 100 feet to 300 feet. Both vehicles were traveling at a rate of from 30 to 35 miles per hour.

"The beer truck was loaded to capacity with beer cases, all of which were full of bottles. Some of the bottles were full of beer and some of them were empty. The cases containing only empty beer bottles were much lighter, of course, than those containing bottles filled with beer. The driver's seat of the beer truck was occupied by three grown men, viz., Ollie Grayson, a colored man, who was driving said truck; R. F. Stovall, beer salesman for the Monroe Grocer Company, Limited, and who had control of the truck; and Barnett Houck, a hitch-hiker, but a good friend of Stovall's. Arthur Thomas, a colored man and a helper, was riding on the top of the load.

"Melvin Lee Smith and Oscar James occupied sitting position in and on the south side of the school bus, or that side next to the center of the highway. Just prior to the happening of the accident, these boys, growing sleepy, and desiring to go to sleep, laid their arms, elbows extended outward, on the sill of the third window of the bus from the front, on the south side thereof, and, resting their heads on their elbows, dropped off to sleep. They were in this position when the vehicles collided. Both received serious head and arm injuries, as a result of which, as had already been stated, both died.

"Plaintiffs in both suits allege that the sole and proximate cause of the accident and resulting death of their said sons was the gross negligence of the driver of the Monroe Grocer Company, Limited's, beer truck; said negligence being particularized, in substance, as follows, to wit:

"(1) That said truck was being driven on its left hand, or wrong side, of the highway, immediately preceding and at the time of the accident.

"(2) That said truck, loaded with beer cases, was being driven in excess of 40 miles per hour, which speed, under the circumstances at the locale of the accident, was careless and reckless.

"(3) That the beer cases on said truck were improperly stacked thereon.

"(4) That said truck was not equipped with clearance lights as is required by law.

"(5) That the cab of said truck was built to accommodate two persons only, whereas, at the time of the accident, the cab was occupied by three good-sized men, creating an overcrowded condition, and preventing the driver of said truck from having free and adequate control of same.

"(6) In the alternative, that defendant's truck driver had the last clear chance of avoiding the accident and did not use it.

"The defendants, in their answer, admit the happening of the accident and the death of plaintiffs' sons as a result thereof, but specially deny all of the plaintiff's allegations of negligence. In turn, they allege a number of special defenses in bar of plaintiffs' right to recover, which, in substance, are as follows:

"(1) That the school bus, in which plaintiff's sons were riding, was being driven on its left-hand or the wrong side of the highway, at the time of the collision, and that the driver of the beer truck was obliged to drive off the paved portion of the highway, on its side and onto the shoulder of the highway, in an effort to avoid the accident.

"(2) That the collision and accident happened because the driver of the school bus was not keeping a proper and prudent lookout.

"(3) That the said school bus was not equipped with clearance lights as is required by law, to the knowledge of said decedents, which fact constituted contributory negligence on their part, such as to prevent recovery in this suit.

"(4) That Melvin Lee Smith and Oscar James, the boys who were killed, were riding with their heads hanging out of the window of the left side of the school bus, and that the accident could not have happened except for this fact, which, on the part of the said deceased, constituted contributory negligence.

"(5) That the occupants of the said school bus had chartered same and had the control and direction of same at the time

of the accident; that by virtue of said control and direction, the said driver was the agent of the occupants thereof, and that the negligence of the driver was attributable to the occupants; and that there existed under the circumstances the relation of master and servant between said occupants and the driver of said bus.

"(6) In the alternative, that the occupants of the school bus, including the decedents, were on a joint enterprise with the driver of the school bus, and that the negligence of the said driver was imputed to its occupants.

"The last two defenses, numbered 5 and 6, appear to have been abandoned, as defendants' counsel made no reference to them in their brief. But if they have not been abandoned, the testimony in the record completely disproves them rather than supports them. On account of the fact that defendants' counsel made no mention of them in their brief, I shall consider them abandoned and make no further mention of them in this opinion.

"It is perfectly obvious that this unfortunate accident was caused by one or by both of said vehicles being on the wrong side of the highway at the moment of the collision. All other issues raised in the pleadings are only collateral or secondary to this one main issue, as I view the case.

"I shall first consider and dispose of this main issue or question and determine from the evidence, if possible, the positions the vehicles involved in the collision occupied on the highway at the time of the accident. In the determination of this question the proximate cause of the accident will no doubt be made manifest.

"The testimony in this case, as is usual in such cases, is very conflicting on the major points involved. Further confusion is added to the situation by the fact that the accident happened in the nighttime, making it impossible for the witnesses to clearly see what happened.

"The plaintiffs contend that defendants' beer truck had encroached upon the side of the highway rightfully and legally belonging to the school bus, thus causing the collision, while the defendants contend, on the other hand, that the school bus had encroached upon the beer truck's side of the highway, and thus that it caused the accident. Defendants plead and some of their witnesses testified that all of the wheels on the right-hand side of the beer truck were off the pavement and on the shoulder of the highway on the south side at the time of the collision. The driver of the school bus made some pretensions that the right wheels of the school bus were off the pavement on the north side of the highway at that time. If these extreme contentions had obtained at the moment the vehicles met, there could have been no collision, of course. So one or both contentions is untenable; and it is my definite conclusion that both are.

"To reach a conclusion as to the location of the vehicles on the highway at the time of the collision between them, it is necessary to consider the testimony of the witnesses who were present and saw the collision and who testified on the point, and to consider the circumstances surrounding the accident as disclosed by the physical facts.

"In a review of the testimony of the witnesses on the point, it is found that Iddo L. Alford, the driver of the school bus, testified that the school bus was ascending the hill, from the east, within the curve, when he saw the lights of the beer truck come over the crest of the hill. The position of the beer truck at that time in the highway was such, as he saw it, that if it continued ahead, without changing its course, it would collide head-on with the school bus. He testified that he could see the black center line on the highway for some distance ahead, and that the left front and left rear wheels of the school bus were approximately 16 to 18 inches over to the right or to the north side of said center line at the time he saw the truck come over the top of the hill. That he cut his bus to the right, even to the edge of the pavement, and that as the beer truck approached it also swerved to its right, but not soon enough to avert the collision. He could not estimate the distance intervening between the two vehicles at the time he first saw the truck, but that they must have been very close together as is evidenced by the suddenness with which they thereafter collided.

"Alford's testimony with reference to the position of his bus on the highway and the movements of both the bus and the truck immediately prior to the moment of the accident is corroborated by the witness, William James Thompson. This witness was a passenger on the bus and was sitting on the front seat of the bus to Alford's right when the collision occurred. Thompson testified that when the beer truck topped the hill and he saw the position it was

in, he shouted to Alford to pull over that it was going to hit the bus. He testified that the school bus was well over on its side of the highway, and that if the truck had continued ahead in the direction in which it was then proceeding when it came over the top of the hill, there would have been a head-on collision, but that the beer truck, as it moved forward, pulled over to the right, instantly throwing the vehicles apart. He estimated the distance between the two vehicles when they came into each other's view at from 100 feet to 200 feet. This witness was in a very favorable position to see all that he claimed to have seen, and he must be classed as a disinterested witness.

"Allen Mabro, another passenger on the bus, testified that he sat near the rear or back end of the school bus, facing rearward, looking out through an open door in the rear end of the bus, and that just before the accident happened, the bus was traveling on its side, or on the north side, of the highway.

"Eaph Bandy, also a passenger on the bus, testified that he was sitting third from the front end on the left-hand side of the bus, looking ahead, and that as the vehicles approached each other, each one of them swerved to its right. When he saw the beer truck it seemed to be coming right into the school bus.

"J. C. Stephenson, another witness for the plaintiffs and also a passenger on the school bus, testified that he did not know what the respective positions of the vehicles were at the time of the accident, but had observed all along the route that Alford was driving the school bus on its side of the highway.

"Claud Rodgers, also an enrollee passenger on the bus, testified that he was sitting on the middle seat in the rear section of the bus, facing the rear, and looking back through the open door in the back end of the bus, and observed just at the time of the collision that Alford was driving said bus on its right side of the highway. He could see the black center stripe on the highway by the reflection of the tail-light on the bus and the headlights of the on-coming beer truck, and observed that the left front and left rear wheels of the bus were fully 18 inches over to the north of the black center line.

"Another witness for plaintiffs, by the name of Cannon, testified that he was a passenger on the bus and that said bus never did get over on the left-hand side of the highway, except when it was passing another vehicle.

"Here we have six witnesses, all passengers on the school bus, corroborating in whole or in part the testimony of Iddo L. Alford, the driver of the school bus, as to the location of the said bus on the highway immediately before and at the time of the collision; the sum and substance of all of this testimony being that immediately before and at the time of the accident the school bus was well over on its side of the highway and that the beer truck was at the time traveling on its wrong side of the highway.

"The testimony shows that the beer truck was occupied by four persons, viz., R. F. Stovall and Barnett Houck, white men, and Ollie Grayson and Arthur Thomas, colored men. Stovall, Houck, and Grayson were riding in the cab of the truck, Grayson driving and Houck sitting in the middle of the three, and Thomas was riding on top of the load of beer cases. These parties all testified for the defendants.

"R. F. Stovall testified that he saw the school bus when it was from 150 to 200 feet away and that at that time, judging from the best he could see the road, the front wheel of the bus was on the black center line. He says that the right front and right dual wheels of the beer truck were off the pavement and on the shoulder of the highway at the time of the collision.

"Ollie Grayson testified that he was driving the beer truck and that at the time he saw the school bus approaching the wheels of the bus, meaning the left wheels, were coming over the black line. He remarked to Stovall that the bus was taking all the highway and immediately pulled the truck over to its right until, at the time of the impact, its right front and right dual wheels were off the pavement and on the shoulder of the highway.

"Barnett Houck testified to substantially the same state of facts as did Stovall and Grayson. He estimated the distance between the two vehicles at the time they came into each other's view at from 100 feet to 150 feet. He also estimated the distance that the school bus got over the black line before the collision at 1½ feet.

"Arthur Thomas testified that he was asleep and did not see anything in connec-

tion with the collision, but was awakened just before the collision by the jolting that the bumping of the wheels of the truck on the rough shoulder of the road made.

"The substance of the testimony of all of these witnesses is that at the time of the collision all of the right wheels of the beer truck were on the shoulder of the highway. It follows, then, according to their testimony, that the left wheels of the school bus were fully if not more than 3½ feet over the black center line on the south side of the road at the moment of the collision.

"Then we have the testimony of Shelby Johnson, mechanic for the Monroe Grocer Company, Limited, who testified that he heard about the accident soon after it happened and went to the scene thereof about 1:30 o'clock next morning, some four hours after the accident. Having heard Stovall, Houck, Grayson, and Thomas talking about the wheels of the beer truck getting off the pavement onto the shoulder of the road, he made an examination of the south shoulder, both that night and next morning when he returned there after daylight, at the place where he estimated the collision occurred, and found tracks imprinted thereon made by Mohawk truck tires, the same as were on the beer truck. The purpose of this testimony is to corroborate that given by Stovall, Houck, Grayson, and Thomas to the effect that the right wheels of the truck were on the shoulder of the road at the time of the accident.

"After giving what I consider to be the proper weight to the testimony of all of the witnesses who testified on this point and the mute evidence given by the physical facts surrounding the accident, I reach the conclusion that the plaintiffs' position is correct, that is, that immediately before and at the time of the collision, the beer truck was traveling on its wrong side of the highway and on the side upon which the school bus was traveling and where the law required it to travel, and that the accident actually and in fact happened on the north side of the highway.

"In reaching this conclusion, I give due consideration to the fact that Iddo L. Alford is a careful and prudent driver. He had driven a school bus for twelve years, averaging 35,000 miles per year, without having an accident. Such a record is proof of the fact that he is a careful and painstaking driver, and it is also proof of the fact that he has not lightly regarded the responsibility that rests upon a driver who is charged with the duty of safely hauling children to and from school. The responsibility that was his in transporting 35 CCC enrollees was almost as great as that in transporting school children, and it must be assumed, in the face of the record he has made as a driver, that he was driving on the night of this unfortunate accident with the skill, care, and prudence that the situation demanded.

"The situation on the other hand is not so conducive to careful and prudent driving. Here we have a large truck loaded with beer cases, a cargo that is capable of rough handling, driven by a young negro man whose experience as a careful and prudent driver is not shown to compare favorably with that of Iddo L. Alford. He must have been handicapped to some extent, to say the least, by the somewhat crowded condition caused by two good-sized men sitting on the driver's seat with him, the testimony to the contrary notwithstanding. I am sure that Ollie Grayson, the driver of the beer truck, was not as solicitous of the safety of his cargo, inanimate as it was, as was Iddo L. Alford of his cargo of immature human beings. That conclusion is in line with the impression one would gain by observing these two parties on the witness stand.

"Then plaintiffs' witnesses, as a whole, made a more favorable impression on the court's mind than the defendants' did. They testified in an open, frank, and straightforward manner. Their testimony had the ring of truth and sincerity about it, and that was particularly true with reference to that of Iddo L. Alford and William James Thompson.

"On the other hand, on another issue, and defendants' able counsel frankly admits it, two of defendants' witnesses, Ollie Grayson and R. F. Stovall, were impeached. That fact greatly weakens the testimony of these two witnesses. There is not sufficient corroboration of their testimony in the record to restore it to the rank of credible testimony. It is true that Barnett Houck's testimony corroborates their testimony in every respect. That was to be expected. Houck and Stovall are good friends. Stovall had befriended him, as the testimony shows.

Close friends usually stand by each other in trouble.

"Moreover, the testimony of each of these witnesses, that is, of Stovall, Grayson, and Houck, coincides most too exactly with that given by all of the others. That fact, of course, does not mean that they were not telling the truth, as they saw it, but, under the circumstances, conceding that they gave their versions as they remembered them, I am forced to the conclusion that their remembrance is based no doubt upon discussions among themselves, rather than upon their actual recollections of what they saw at the time of the accident. For example, immediately after the accident Grayson and Stovall gave testimony under oath that the beer truck was not equipped with clearance lights at the time of the accident. On the trial of this case, they both testified that said truck did have clearance lights on it at that time, making their testimony coincide with that of other defense witnesses on that point.

"The testimony of these three witnesses is corroborated by the testimony of Shelby Johnson in that he testified that he found Mohawk tire tracks on the shoulder of the highway at or near the scene of the accident; it being testified by said witnesses that the right wheels of the truck ran off the pavement and onto the shoulder of the highway immediately before and was on the shoulder at the time of the collision. Johnson's testimony has one unfavorable feature about it. As important as this fact was, the record does not show that this witness ever told the sheriff or any of his deputies, the coroner, or any member of the Army Board of Inquiry, or any other officer making an investigation, that these tire tracks were there on the shoulder of the highway. His testimony is weakened by the fact that none of these officers, whose duty it was to make an investigation and who did make an investigation of the accident, found these tire tracks. Mr. E. K. Theus, one of counsel for defendants, went to the scene of the accident next morning, arriving there about 8 o'clock, and made an examination. He did not find these tracks, and they were not shown to him. Captain J. E. Kidd, acting officially in his capacity as an army officer, went there next day and made an examination of the road, and he did not find any such tracks.

William James Thompson examined the shoulders of the road the following Monday and he did not find any tire tracks thereon.

"Furthermore, if Shelby Johnson did see any tire tracks on the shoulder of the highway that were made by the beer truck, the testimony in the record does not establish it as a fact that they were at the place where the accident occurred. Nobody knew the exact spot where the collision happened, and nobody pointed out to Johnson the point where it was supposed to have happened. He went out to the scene of the accident and looked it over and reached his own conclusion as to where it happened. I am convinced that any tracks he saw were made when the beer truck ran off the pavement after the actual collision had occurred, further reference to which will be made later on in this opinion.

"There are other circumstances that corroborate the plaintiffs' contentions and demonstrate the weakness of defendants' contentions.

"The pavement on the highway at the point of the accident is 18 feet wide. The width of either half of it is therefore 9 feet, or 108 inches. The over-all width of the beer truck is 7 feet 2 inches, or 86 inches. The over-all width of the school bus is 6 feet 11 inches, or 83 inches.

"If defendants' contention be true that the right wheels of the beer truck were on the shoulder of the highway at the time of the collision, then at least 1½ feet of the total width of the beer truck was off the pavement, leaving thereon a maximum of approximately 5½ feet of open space on the north side of the south half of the pavement at the time the beer truck was on the shoulder of the road. Then, to have sideswiped the said beer truck, the school bus would have had to encroach fully 3½ feet over the black center line onto the south side of the highway to do so. The greatest distance that any witness for defendants (Houck) put the school bus over the black line was 1½ feet. Undoubtedly, the school bus, under the testimony in this case, was not traveling right down the center of the highway. That is where it would have had to be in order to collide with the beer truck, if the testimony of defendants' witnesses is true that the right wheels of

the beer truck were on the shoulder of the highway.

"The location of the débris left on the pavement from the collision is a circumstance in favor of and corroborating the plaintiff's contention. The weight of the testimony is that the bulk of this débris was north of the center line of the pavement. That is the effect of the testimony of Iddo L. Alford, Wm. James Thompson, Eaph Bandy, Claud Rodgers, and Nathan Otwell; some of the witnesses mentioned having seen blood stains on the north side of the pavement at or near the scene of the accident. The testimony makes it clear that these blood stains were at the place where Alford stopped his bus after the accident, and were made when and where the injured boys were taken out of the bus and laid on the pavement in front of the headlights of the bus. This happened several hundred feet from the place where the accident occurred. There is no testimony in the record that seriously conflicts with that of the above-named witnesses on the point involved. The location of broken window glass and other broken pieces of cars involved in a collision is usually a safe indicator of the position of the cars involved when the collision occurred, and I think such is true in this case.

"My theory of the manner in which this unfortunate accident happened, formed from a careful study of all of the evidence in the record, is that the beer truck, in entering the right-hand curve in the highway, as it approached the scene of the accident, instead of turning to the right with the curve, proceeded ahead in a straight course into the apex of the curve, and, upon reaching the crest of the hill, was well over on the north or wrong side of the pavement. With the beer truck in this position on the highway, the driver of said truck found himself immediately confronted with the school bus ascending the hill from the east. The distance between them at that moment was very short. The school bus was on its side of the road. In order to avert a head-on collision of the two approaching vehicles, the driver of the beer truck swerved that vehicle to its right, but they were too close together to avoid the collision. All of the eyewitnesses, including the driver of the beer truck, testified that he, said driver, swerved said truck to the right immediately before the impact. According to this theory, the beer truck was traveling at an angle toward the south edge of the pavement at the moment of the impact, and it continued in that course until its right wheels reached the shoulder on that side of the highway, and it was then, and not before the impact, that the occupants of the beer truck felt the bumping sensation, or what they took to be such, caused by the wheels rolling on the rough shoulder.

"It is to be noted in this connection that, according to the testimony of Shelby Johnson, the point where the truck wheels ran off the pavement was 56 steps, or 110 feet, from the crest of the hill. The occupants of the two vehicles estimated the distance between them when they came into open view of each other from 100 feet to 200 feet. Let us accept the mean estimate of 150 feet as correct. Both traveling at approximately the same rate of speed, as the testimony shows they were, they would have met and collided at a point 75 feet east of the crest of the hill. From that point the beer truck had some 35 feet to travel before it reached the point where Shelby Johnson found its tracks on the shoulder of the highway. Any reasonable calculation that one can make with the estimates of distance given by the witnesses will prove that the accident occurred before the beer truck reached the shoulder of the road.

"The collision of the two vehicles was caused by the beer truck being on the wrong side of the highway at that time.

"It is evident that the two boys, Melvin Lee Smith and Oscar James, were killed by the protruding end or ends of one or more beer cases of the cargo of the beer truck. Said truck was loaded with both full and empty beer cases. The body of said truck was constructed with open sides and closed ends. The sides were left open, no doubt, so that defendant's employees could more conveniently load and unload the cases. The closed ends served to prevent these cases from falling off at each end of the body. In constructing said body according to such a plan, the owner thereof most certainly subordinated the safety of the public to convenience of its employees in handling its beer cases. So long as the highway is straight and level and there is nothing to jar the beer cases off of said body, there is no need for any protecting walls on the sides thereof; but on this particular occasion there was great need for such. It is obvious that when the front portions of these vehi-

cles collided, the jar or jolt resulting therefrom upset and dislodged some of the beer cases on the truck, causing them to protrude and extend over the edge of the open body and just far enough to strike the heads and arms of said two boys. The use of a truck body so constructed and the loading of beer cases therein in the manner in which they had been loaded and hauled on this occasion, that is, loaded and hauled in such manner that they could be dislodged by a jolt of the truck and thereby caused to fall off or protrude into the pathway of other vehicles using the highway, was, in my opinion, gross negligence; and which negligence, coupled with that of the driver of the beer truck in driving that truck onto the wrong side of the highway and causing a collision with the school bus, constitute the sole and proximate cause of the accident and the resulting death of Melvin Lee Smith and Oscar James.

"Plaintiffs are entitled to recover the damages they sustained on account of the death of these two boys, unless it be that said boys were themselves guilty of such contributory negligence as will bar plaintiffs' recovery. Defendants plead contributory negligence on the part of Melvin Lee Smith and Oscar James as a special defense against plaintiffs' recovery in this suit.

"It is contended, first, that said Melvin Lee Smith and Oscar James were asleep with their heads in an open window, and that in so going to sleep, and in sleeping with their heads in the open window of the bus, they were contributorily negligent and assumed the risk of such injuries as might be caused by reason of their heads being in the window. And it is contended, second, that said decedents were riding in the nighttime on a bus required by law to be equipped with clearance lights that had none on it, and that in doing so they were contributorily negligent and assumed the risk of such damages as might be caused by reason of the fact that the bus had no clearance lights on it.

"Contributory negligence is very clearly defined in Thompson on Negligence, § 165, in the following language: 'Contributory negligence, in a sound and judicial sense, is the negligence of the plaintiff, or of the person on account of whose death or injury the action is brought, amounting to want of care, and proximately contributing to bring about the injury. The clear modern doctrine is that, in order to constitute such negligence as will bar a recovery of damages, these two elements must in every case concur: 1. A want of ordinary care on the part of the plaintiff, or where the action is for damages resulting in death, a want of ordinary care on the part of the person killed; and 2. A proximate connection between this want of ordinary care and the injury complained of.'

"First, were the deceased boys negligent in sleeping with their heads in the window of the bus, and, if so, was there any proximate connection between such negligence and the injury complained of?

"I do not think they were negligent in so doing, but if it be conceded that they were negligent in that respect, then, under my theory of the case and according to my interpretation of the evidence, there was no proximate connection between their said negligence and the cause of the injury they sustained.

"It is defendants' contention that these boys' heads were protruding beyond the sill of the open window at the time of the accident. The testimony does not establish such contention as a fact. The only testimony given in the record that can furnish a basis for this contention is that of J. W. Edwards, one of the enrollee passengers on the school bus. The pertinent portion of his testimony on this point is as follows:

" 'Q. Did they (meaning the deceased boys) have any part of their body extended out? A. Yes, sir.

" 'Q. What part? A. Their arms and heads.'

"If this witness' testimony had stopped at this point there would be a sound basis for defendants' conclusion that the boys' arms and heads were extending beyond the body of the bus; but he gave further testimony of the subject:

" 'Q. You know about how far they were extended out? A. No, not exactly.

" 'Q. You know about how long before this accident occurred that you saw them with their heads and arms extended out? A. About ten minutes.

" 'Q. They had their elbows in the corner of the window? A. Yes, sir.

" 'Q. And you didn't look down the outside of the school bus to see if their heads were actually protruding out? A. No, sir.

" 'Q. Did you pay any attention to see whether their heads were out of the window sill? A. No, sir.

" 'Q. You just thought that because their heads were on their arms that their heads were protruding out? A. Yes.'

"The most that can be said of this testimony is that it is an expression of the opinion of the witness, based upon things that he saw some ten minutes before the accident occurred. His testimony proves nothing.

"These boys could have easily been killed and their heads not protruding beyond the window sill. The beer truck knocked off the window sill and the outside frame of the window as it passed the bus. If the tops of the boys' heads had been only even with the outer edge of the window sill, the blow would have killed them.

"These boys had the right to assume, I think, that the driver of the bus would stay on his side of the road, and that those using the other side of the road would likewise stay on their side of the road, in which event they would be perfectly safe in sleeping with their heads in the window, and if they did have that right, they were not negligent in what they did. It cannot be said that their sleeping with their heads in the window of the bus had any causal connection with the happening of the accident that snuffed out their lives. That fact had nothing to do with the beer truck being on the wrong side of the highway. Both vehicles may have been in the wrong position on the highway at the time of the accident; but, if so, the presence of the heads and arms of these two boys in the window of the bus in no manner induced the drivers to maneuver them into such positions.

"Again, on the second ground of contributory negligence urged by defendants, let us admit, arguendo, that Melvin Lee Smith and Oscar James actually knew that the school bus upon which they were riding did not have clearance lights on it and that the law required it to be equipped with such lights. It cannot be said that the absence of clearance lights on the bus had any causal connection with the beer truck encroaching on the school bus' side of the highway. Under the testimony, as I interpret it, the beer truck got on the wrong side of the highway before its driver saw the bus coming toward it. That being true, there was no proximate connection between the absence of clearance lights on the bus and the cause of the collision.

"The plea of contributory negligence is not well founded.

"Plaintiffs' counsel have not urged their alternative plea of the last clear chance doctrine as a ground for recovery in this suit. I therefore consider that they have abandoned that ground as being without merit. It is without merit, as it had no application to the facts and issues of this case.

"Plaintiffs, Andrew R. Smith and wife, claim and itemize damages as follows:

| | |
|---|---|
| For loss of love and companionship of their son | $ 3,000.00 |
| For loss of his maintenance and support | 5,000.00 |
| For their shock, grief and suffering caused by the news of his untimely death | 3,000.00 |
| For the shock and pain suffered by their son during the 5¼ hours that he lived after the accident | 3,000.00 |
| For funeral and burial expenses | 250.00 |
| Total | $14,250.00 |

"The record shows that Melvin Lee Smith was 18 years old, 1 month, and 21 days at the time of his death; that he had always resided with his parents, and was a kind and affectionate son. He was in robust health, was industrious, and, notwithstanding his youth, had made, and at the time of his death was then making, a substantial contribution to the support of his said parents and the other children, his brothers and sisters, of the family. On account of the burden that fell upon him in connection with his having to work to help support his family, he was never able to attend school but very little; consequently, his education was very limited. He was earning $30 per month at the time of his death and contributing $25 per month out of his earnings to his parents and their family for maintenance and support. They had a right to expect continued material assistance from such a thoughtful and industrious son as he was.

"Able counsel for both plaintiffs and defendants have submitted a number of cases bearing on the quantum of damages in this case. There is no fixed or well-defined rule or principle established by our laws or jurisprudence to guide the court in determining the amount of damages that should be allowed. The quantum of damages is arrived at in each case from a consideration of the facts and circumstances peculiar to the individual case. Considering all of the cases that have been submitted for

the guidance of the court, including the similarity of the facts and circumstances of each case to the one at bar, I have been led to the conclusion that the case of Dinet et al. v. Orleans Dredging Company, Inc., et al., La. App., 149 So. 126, is the one whose facts and circumstances most nearly coincide with the case at bar. In that case, the youth who was killed in an accident was 14 years old, lived with his parents, and contributed $5 per month to their maintenance. In the case at bar the son who was killed was contributing $25 per month to the support of his parents at the time of his death; but there is no certainty that this contribution would have continued for any definite length of time on account of the fact that the work he was doing is of an emergency nature. In the Dinet Case the court allowed the parents of the deceased boy damages in the amount of $8,000, and that will be the award in this case. In addition, Andrew R. Smith incurred expenses in connection with the funeral and burial of his son in the amount of $60. He is entitled to judgment for that amount.

"For the reasons herein assigned, the plaintiffs, Andrew R. Smith and Mrs. Susie Smith, should have judgment herein in their favor and against the defendants, Monroe Grocer Company, Limited, and the Trinity Insurance Company, in solido, for the full sum of $8,000, with legal interest from judicial demand, until paid, to be equally divided between them; and, further, there should be judgment herein in favor of Andrew R. Smith, individually, and against said defendants, in solido, for the sum of $60, with legal interest from judicial demand until paid; the said defendants to pay all the costs of this suit.

"E. L. Walker, Judge."

We hereby adopt the opinion of the lower court as our own.

Plaintiffs and appellees have answered the appeal taken by defendants, and pray that the judgments in their favor each be increased in the amount of $2,000. In fixing the amount of damages, each case must be governed by the facts peculiar to itself. There is no set rule which governs. Under the facts and circumstances of this case, we are of the opinion the amounts awarded by the lower court do substantial justice between the parties, and we will not disturb the award.

The judgment of the lower court is therefore affirmed, at defendants' costs.